**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

**JUMEL H. SHAIDNAGLE, INDIVIDUALLY, AND**
**ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES**
**OF NICHOLAS L. PASTOR, DECEASED, AND THE ESTATE**
**OF NICHOLAS L. PASTOR, DECEASED**                                **PLAINTIFFS**

**V.**                                    **CIVIL ACTION NO. 5:13-cv-112-DCB-JMR**

**ADAMS COUNTY, MISSISSIPPI,**
**by and through its Board of Supervisors,**
**ADAMS COUNTY SHERIFF'S**
**DEPARTMENT, CHARLES R. "CHUCK"**
**MAYFIELD, JR., Sheriff of Adams County, Mississippi,**
**in his individual and official capacities, LAURA SMITH,**
**RONALD DUNMORE, GARY CONN, LAKEISHA**
**OWENS, JAMES ALLRED, CHARLES HARRIGILL,**
**and JOHN DOES I - V, officially and in their**
**individual capacities**                              **DEFENDANTS**

<u>**PLAINTIFF'S SECOND SUPPLEMENTAL DESIGNATION OF EXPERTS**</u>

COME NOW Plaintiffs and files this Second Supplemental Designation of Experts as follows:

Plaintiffs, incorporating all previously filed Plaintiff's Designation of Expert Witnesses, including Plaintiff's Supplemental Designation of Experts and Plaintiff's Designation of Rebuttal Expert previously filed in this action as if reproduced herein, hereby supplement Plaintiff's prior designation as to experts and/or designates Mr. Ronald Dunmore as a rebuttal expert, as follows:

(1)    Mr. Ronald Dunmore
       Three Hope Lane
       Natchez, MS

Though not specifically retained by Plaintiff, Mr. Dunmore will provide opinion testimony consistent with his deposition testimony taken in this action. The deposition testimony of Mr.

Dunmore in this action is incorporated herein as if reproduced in full, and is attached hereto as Exhibit "A". If asked, Mr. Dunmore is expected to provide opinion testimony relative to the following, consistent with his deposition testimony: the appropriateness of placing a detainee, such as Mr. Pastor, on suicide watch based on receipt of a judicial determination that he was a danger to himself; the policies and procedures in place at the Adams County Jail in July, 2012 relative to individuals on suicide watch, including the objects and things they are allowed to possess, the furnishing of paper clothing to such individuals, the means and frequency of observing individuals placed on suicide watch; and that it was Laura Smith who placed a "Y" in the booking documents next to the "suicide watch" determination. Mr. Dunmore is also expected to testify that had ACSO received the Order to Hold, Mr. Pastor would have been placed on suicide watch and not given any clothes because he might have hung himself; that the normal process of the jail was that detainees such as Mr. Pastor would have been given a paper gown; that when ACSO receives an order signed by a judge in Adams County, Mississippi that says an inmate is a danger to himself, a jailer is going to treat that individual as a suicide risk and to do otherwise is unreasonable; and that if on suicide watch, the detainee is given only paper clothes and observed every 15 minutes; that the jail had paper gowns prior to Mr. Pastor's death; that Mr. Dunmore does not have any special training in determining whether someone is a suicide risk, and that he does not attempt to do that when he books people into jail; that if a jailer would have checked on or observed Mr. Pastor after 4:35 p.m. on July 28, 2012, the camera present would have recorded the observation on video; that if an inmate is a suicidal risk the deputies owe that individual a duty to prevent him from committing suicide and that it is unreasonable not to fulfill that duty; that Laura Smith as the shift sergeant who made the ultimate determination that Mr. Pastor was or was not to be on suicide watch, and; that if the jailers had seen the Order to Hold, Mr. Pastor would probably be alive today.

Page 2 of 3

Plaintiff reserves the right to supplement these opinions in accordance with the Federal

Rules of Civil Procedure and Uniform District Court Rules.

DATED: September 25, 2014

Respectfully submitted,

**JUMEL H. SHAIDNAGLE,
PLAINTIFF**

BY: s/Michael T. Jaques_____
　　　　　One of Her Attorneys

**Michael T. Jaques, MSB No.  8708
SESSUMS DALLAS, PLLC
240 Trace Colony Park Drive
Suite One Hundred
Ridgeland, MS 39157
Telephone: 601-933-2040
Facsimile: 601-933-2050
Email: mjaques@sessumsdallas.com**

## CERTIFICATE OF SERVICE

I, **Michael T. Jaques,** do hereby certify that I have, this day, electronically filed the foregoing with the Clerk of Court using the ECF filing system which sent notification of such filing to the following: William Allen at wallen@aabalegal.com

**THIS** the 25th  day of September, 2014.

s/Michael T. Jaques_____
Attorney for the Plaintiff

0001

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

JUMEL H. SHAIDNAGLE,INDIVIDUALLY,
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF NICHOLAS L. PASTOR, DECEASED,
AND THE ESTATE OF NICHOLAS L. PASTOR, DECEASED
                    PLAINTIFFS
V.          CIVIL ACTION NO. 5:15-cv-112-DCB-JMR
ADAMS COUNTY, MISSISSIPPI,
by and through its Board of Supervisors,
ADAMS COUNTY SHERIFF'S DEPARTMENT,
CHARLES R. "CHUCK" MAYFIELD, Jr.,
Sheriff of Adams County, Mississippi,
in his individual and official capacities,
LAURA SMITH, RONALD DUNMORE, GARY CONN,
LAKEISHA OWENS, JAMES ALLRED, CHARLES HARRIGILL,
and JOHN DOES I-V, officially and in their
individual capacities          DEFENDANTS
**************************************************
        DEPOSITION OF RONALD DUNMORE
**************************************************
June 18, 2014, 3:13 p.m. at USDC 109 South Pearl St.
    Federal Courthouse, Natchez, Mississippi

0002

APPEARANCES:
        MICHAEL T. JAQUES
        SESSUMS DALLAS, PLLC
        240 Trace Colony Park Drive
        Suite One Hundred
        Ridgeland, Mississippi, 39157
        TELEPHONE:  (601) 933-2040
        FACSIMILE:  (601) 933-2050
        E-MAIL:  mjaques@sessumsdallas.com

        COUNSEL FOR PLAINTIFFS


        WILLIAM R. ALLEN, Esq.
        ALLEN, ALLEN, BRELAND & ALLEN, PLLC
        214 Justice Street
        Brookhaven, Mississippi  39601
        TELEPHONE:  (601) 833-6647
        FACSIMILE: (601) 833-4361


EXHIBIT "A"

E-MAIL: wallen@aabalegal.com

COUNSEL FOR DEFENDANTS

Reported by: Tina Wilkinson, CSR #1138, RPR #31921
615 Berridge Dr. Ridgeland, MS 39157 (601) 540-7665

0003

INDEX

Style and Appearances............................1
Index and Exhibits................................3
Examination by Mr. Jaques.........................4
Examination by Mr. Allen.........................41
Certificate of Court Reporter....................42
Deponent's Certificate...........................43

EXHIBITS

Exhibit Number 11 - (1 page) Voluntary statement
    written by Ronald Dunmore dated 6-28-12.....39

0004

RONALD DUNMORE,
after having first been duly sworn, was examined and testified under oath as follows:

EXAMINATION BY MR. JAQUES:

Q   It's Mr. Dunmore, correct?

A   Yes.

Q   Mr. Dunmore, my name is Michael Jaques. I am an attorney from Ridgeland, Mississippi. And I represent the wrongful death beneficiaries of Mr. Nicholas Pastor who died in the Adams County jail on July 28th, 2012. I am going to take your deposition today. I will ask questions. You will hopefully answer them. The court reporter will write down

everything that we say.

A    Okay.

Q    Have you ever been deposed before?

A    No.

Q    Well, just a couple of easy rules.  First, only one of us can talk at a time, okay?

A    Okay.

Q    And you are doing a good job of what I am about to tell you next, and that is you need to verbalize your responses so they are both recorded and so she can write them down.

A    Correct.

0005

Q    If you need to take a break, please feel free.  If I ask a question that you don't understand, please ask me and I will be glad to repeat it.

A    Okay.

MR. JAQUES:  Let the record reflect this is the deposition of Mr. Dunmore being taken pursuant to notice.  Let's use the same stipulations that we had in the prior depositions with respect to reservation of objections.

Q    (Mr. Jaques)  State your full name, please, sir.

A    Ronald Earl Dunmore.

Q    Mr. Dunmore, what is your address?

A    Three Hope Lane.

Q    And what city would that be?

A    Natchez.

Q    And are you married, sir?

A    Yes.

Q    And what is the name of your wife?

A    Vera Dunmore.

Q    She lives with you?

A    Yes.

Q    Do you and Mrs. Dunmore have any children?

A    We have three daughters and three grand kids.

0006

Q    Do any of those children live in Adams County?

A    My daughter just got married, but she comes home, but her husband works on the bridges and he moves alot and she moves with him.

Q    What I am trying to find out is family members that you and your wife have that live in

Adams County.  Can you tell me who?

A   My father lives in Adams County.

Q   And what is his name?

A   Horace Dunmore.

Q   Does he still work, Mr. Dunmore?

A   No, my father is 86.

Q   Deserves a break.  What kind of work did he do before he retired?

A   Truck driver.

Q   And has Mrs.  Vera ever worked?

A   Yes.

Q   Where?

A   She is was a principal at Frazier Elementary School.

Q   Is she retired now?

A   Well, my wife is ill and she was forced to retire.  She had to have heart surgery.

Q   I'm sorry to hear that.  Did she ever work

0007

in the last 20 years anywhere other than that school?

A   No, no.

Q   Any other family in Adams County or along the river, running up north?

A   No, my family doesn't live here.  They live in Illinois, Chicago.

Q   What about your wife's family?  What is her maiden name?

A   York, Y-O-R-K.  Her family is deceased, her mom and dad.

Q   Does she have any brothers and sisters, cousins?

A   Now her brother, he also has the same thing my wife has.  He is in Jackson at University now going through heart surgery.  It's something that runs in the family.  And have a baby sister named Patricia.  She lives here in Natchez.

Q   What is her last name?

A   Her last name is Tillman.

Q   Does she have any children?

A   Three.

Q   And do they live here in the Natchez area?

A   One of them does, the baby boy.

Q   What is the baby boy's name?

A   I call him Junior.  I think it is Greg, Jr.

0008

Q   How old is he?

A    Fifteen, I think.

Q    All right, any other family members you can think of?

A    No, that is it.

Q    You are employed now?

A    Yes.

Q    Where do you work?

A    Adams County Sheriff's Office.

Q    And what is your position, Mr. Dunmore?

A    Now I am -- I work at the courthouses.

Q    Is there a title?  Are you a deputy or are you a jailer?

A    Well, I am something like a deputy bailiff like thing.

Q    Are you the man that makes the lawyers behave when they go to court?

A    No (laughing).

MR. ALLEN:  He makes sure they don't bring anything to court to misbehave with, though.

Q    (Mr. Jaques)  Can you give me sort of a summary of your education?  Did you finish high school?

A    Yes.

Q    And where was that, sir?

0009

A    South Natchez High School.

Q    What year?

A    In '76.  I also went to Co-Lin Junior College.

Q    For how long?

A    A year and a half until my wife got pregnant.

Q    And did you study anything in particular?

A    Yes, small business management.

Q    Besides that one and a half years at Co-Lin, have you had any other formal education?

A    No.

Q    What about seminars or training programs or things like that?

A    Well, I am also, I do plumbing work and I have been doing that for awhile.  I also worked at Angola State Penitentiary.

Q    Okay, let me stick with education for just a minute.  So other than the time at Co-Lin, have you had any other --

A    No, no, no.

Q   You are going to have to let me finish all the way before you answer.  She can only write one at once.  Let's talk about work history.  You finished high school in '76?

0010

A   Uh-huh (Indicating yes).

Q   Correct?

A   Correct.

Q   Then you went to Co-Lin for a year and a half?

A   Yes.

Q   That will take us up to '77 or '78.  Did you then become employed?

A   Yes.

Q   Where?

A   American United.

Q   What is that?

A   That is where they build covered pipes.

Q   And what was your job there?

A   Making and covering pipes, making the covered pipes.

Q   And how long did you work there?

A   Until they closed down, say about maybe three years.

Q   And then where did you go, sir?

A   From there, I went into a plumber helper.

Q   Was that with just an individual or --

A   Well, it was Meng M-E-N-G Plumbing Company.

Q   And how long did you stay with them?

A   Oh, a long time.  I want to say about eight

0011

years.

Q   And then where did you go?

A   Angola State Penitentiary.

Q   And what year did you start at Angola, if you remember?

A   I think it was '98, '99 when I was in the academy.

Q   So between high school and going to Angola, that was about 20 years.  Most of that was spent with the plumbing company?

A   Yes.

Q   And what did you do at Angola?

A   I was, I moved up from dormitory to walk sergeant.  I was over 4 officers and about 750 inmates.

Q   So you had a job there.  You weren't a prisoner, right?

A   Right.

Q   I'm just messing with you.

MR. ALLEN:  It's the end of the day.

Q   (Mr. Jaques)  So at Angola, how long did you stay there?

A   I stayed there almost 10 years.

Q   That would bring us up to about 2008?

A   Right.

0012

Q   And where did you go then?

A   Fruit of the Loom over in Vidalia.

Q   What was your job there?

A   I worked in maintenance.

Q   How long did you stay at Fruit of the Loom?

A   Until 2006, I want to say 2006.

Q   You went to Angola in 1998?

A   Uh-huh (Indicating yes).  I stayed there until 1999.  I worked there almost ten years.  I mean, it was probably '88, I'm sorry.  But I stayed there almost 10 years.

Q   All right, when did you leave Angola?

A   In '99.

Q   In '99, you went to work at the -- where, Vidalia?

A   In Vidalia.

Q   What was that place called?

A   Fruit of the Loom.

Q   And you started there in '98.  How long did you stay?

A   Until 2006.

Q   Where did you go then?

A   Sheriff's department.

Q   Adams County?

A   Yes, sir.

0013

Q   Who hired you?

A   Ronnie Brown.  He was the sheriff then.  I got hired in 2007.

Q   Was there a reason you left Fruit of the Loom?

A   They was laying off and I had asked about coming over here.

Q   What position were you hired for in the Adams County Sheriff's Office?

A    I started off and I went to the academy. We had, there was auxiliary deputy academy. And then after that, they needed a jailer. And then I went from there inside the building.

Q    When did you start as a jailer?

A    2007.

Q    And have you gotten any promotions or risen in rank since 2007?

A    No. I had gotten transferred to the courthouse.

Q    And when did that happen?

A    About a couple of years ago.

Q    Was that before or after Mr. Pastor died?

A    That was after.

Q    On July 28th, 2012, when Mr. Pastor died in the Adams County jail, what was your position?

0014

A    Jailer.

Q    Did your job duties change at all when Sheriff Mayfield came in?

A    I don't understand.

Q    Did you switch jobs from Brown to Mayfield?

A    Yes. I stayed as a jailer.

Q    You just stayed with what you were doing?

A    Right.

Q    Do you remember Mr. Pastor?

A    Yes.

Q    What do you remember about him?

A    He was a tall white guy. He was very talkative.

Q    About how tall was he, do you remember?

A    A little taller than me.

Q    How tall are you?

A    I'm about five foot six.

Q    Other than him being a little bit taller than you and talkative, do you remember anything else about him?

A    No.

Q    Do you remember any conversations that you had with him?

A    Well, yes, when I was booking him in, he wasn't really talking to me. He was talking to Conn

0015

about all of his tattoos and how he was going to take one of them off his leg. And then when he pointed at his leg, he said, Oh, feel right here. I got some

screws right here.  And Mr. Conn was feeling his leg.
And he was just talking more to him than I was
because I was booking him in.

Q   You said while you were booking him in.
Explain to me, if you can, Mr. Dunmore, the process?

A   Okay.  Well, the process when we are
booking in, we start with the first sheet, and that
information sheet about his name and all of that
stuff and where he lives at.

Q   Okay, but take me from the point where he
comes into the Sally Port.  Who brings him in?  Who
gets him?

A   Okay, once he go in the Sally Port, he have
a seat and what we do is go back in the back; we will
search him.  Once we search him and he don't have no
contraband, we will put him on a jumpsuit.  After
that, we do the booking process.  We start, and after
we book, we key on the computer.  We go over to the
fingerprint machine and do the fingerprints like we
do all the inmates.

Q   Do you take a mug shot of him, too?

A   Yes.

0016

Q   So with respect to Mr. Pastor, who was the
deputy or officer that brought him to the jail?

A   Now that I don't know, because I was
upstairs.  And when I come down, I didn't see no
deputy.  We have a big glass where he will sit and
the person in the control room could watch him.  So I
don't know what deputy brought him in.  That, I don't
know.

Q   At the time you first saw Mr. Pastor, was
he wearing stripes or was he in civilian?

A   No.  He was in regular clothes.

Q   Regular clothes?

A   Regular clothes.

Q   And where was he located?

A   Right there sitting down on the chair.

Q   In front of the control room?

A   Yeah, by the window.  Well, we could look
out, we got a window here and we can look out at the
holding cells.

Q   Do you remember what he was wearing?

A   I don't really know.  It has been two
years.  I don't want to lie, so I don't -- I can't
recall it.

Q   Do you remember what time that was?
A   Well, I booked him in.  It was about 14:40

0017
when I started booking him in.
Q   So the process as I understand your
testimony is, Nick Pastor is sitting in the control
room in a chair?
A   No, he is not in the control room, no.
Q   I'm sorry, in front of the control room?
A   Yeah.  We have what you call an area where
the inmates, when they come in, they would have a
seat.
Q   If we can look at deposition Exhibit 4, and
I will tell you that is not exactly to scale.  But if
you will see there is a little, see where it says
Cell One in blue?
A   Uh-huh (Indicating yes).
Q   And then this is the booking.  What is this
called, booking room or something right here?
A   Uh-huh (Indicating yes).
Q   And this is over the control room.  Was he
sitting in this room where my pen is?
A   May I turn it around my way?
Q   You sure can.
A   There is, if I am not mistaken, how you go
the Sally Port, you come in, you turn here and go
into where we are at.  But there is a little room
right there and there is a phone set here.  It is

0018
right in here.
Q   Okay.
A   But the chair, we got about three chairs.
Q   Yes.  I know what you are talking about.
And there is a camera that videos it, right?
A   Yes.  It looks at where they are sitting
at.
Q   It's the room that it joins the cell where
he was found dead, correct?
A   What do you mean now?
Q   It's the room he was in when you first saw
him, was right next to the cell where he was found
dead?
A   Across the way, yes.
Q   So you come in there and he is in civilian
clothes, correct?
A   Uh-huh (Indicating yes).

Q   You need to say yes or no.

A   Oh, yes.

Q   And what do you do with him at that point?

A   At that time, we went to what we call, we will go up and get what you call a set-up.  And a set-up consists of a mattress, a towel, toothpaste, toothbrush, a drinking cup, and some soap where he can clean himself up once he is inside the holding

0019

cell.

Q   My question is, you see Mr. Pastor for the first time right then, right?

A   Yes, sir.

Q   Had you ever known him before?

A   No.

Q   Did you know anybody that he was related to?

A   No.

Q   Do you know Walt Brown?

A   Yes.

Q   Do you know whether or not Walt Brown and Mr. Pastor are related?

A   I didn't know at the time.  Now how I met, how I knew who Walt was, okay, once we got through booking and putting him in, we have some dogs we take out, outside, and they walk them and use the bathroom and stuff.

And one of the inmates, named Shawn Timmons, and he saw this man.  And I asked him who he was?  And that is when he told me his name was Walt Brown.  I said, Well, how do you know him?  He said, Well, that's my child's cousin.  And that was my first time ever -- I had heard of him, but I have never met him until then, and when I met him he was walking into

0020

the jail.

Q   Mr. Brown was?

A   Yes.

Q   So you see Nick Pastor for the first time sitting in that room in civilian clothes?

A   Yes.

Q   Do you make him get up and go with you somewhere?

A   Well, I get him where we can go ahead and dress him out and search him and dress him out.

Q   And where did y'all take him to do that?

A    In the back of the ID room.

Q    And did you have any conversations with him?

A    Well, like I said, when Mr. Conn and I was dressing him out, once he dressed out, then the booking process come.

Q    Starts?

A    Starts, yes.

Q    And did he say anything about why he was arrested or was he mad or anything?

A    No, he wasn't.

Q    Did you know why he was there?

A    No, we didn't.

Q    Did you ever determine why he was there?

0021

A    No.  When I was booking him in, it was questions on our booking sheet that we asked.  It is a procedure that we go through.  Either they tell us yes or no.  And those are the procedures that we filled out.

Q    I am going to hand you what what has been marked, let's start with Exhibit 7.  And ask you if you recognize that document or at least the information on there?

A    Uh-huh (Indicating yes).  I recognize this.

Q    What is that, sir?

A    This is a sheet on Mr. Pastor.

Q    And what kind of sheet is it?  Is that an intake sheet?

A    Seems like it is.

Q    And did you complete any information on that sheet?  And by complete, I mean did you enter it into the computer system?

A    Uh-huh (Indicating yes).

A    Yes.  I was the searching officer.  Mrs. Ward did the intake.

Q    Mrs. Ward?

A    Laura.

A    Well, I'm sorry; that was her maiden name.  Mrs. Smith.  Her maiden name, she was a Ward then,

0022

but she did the intake.

Q    So --

A    I was the searching officer.

Q    So describe for me your conversation or how you obtained the information that you completed on

this sheet?

A   Okay, once we go in the back, this is already done, so we just went on to the what you would call a medical questionnaire sheet that we goes through.

Q   Okay.  Before we get to that, though, do you see how there is some stuff that's highlighted in pink on that form?

A   Yes.

Q   And do you see how there is some stuff not highlighted in pink?

A   Uh-huh (Indicating yes).

Q   Is there anything highlighted in pink that you put on that form?

A   I honestly don't know.

Q   Is there anything that is not highlighted in pink that you put on that form?

A   No.  I don't know.  I can't really recall, but I don't think so.

Q   And for the record, we are talking about

0023

CLT 15, Exhibit 7.  You have no recollection of completing any of the information on there?

A   No, sir.

Q   I will ask you to look at Exhibit 8, which is CLT 16 and ask you the same question.  Did you complete or enter any of the information on that form into the computer with respect to Mr. Pastor?

A   (Witness examines document).  I can't really remember.  I know my signature is at the bottom.  I may have, but honestly, it has been a couple of years.  But I know that if I signed it, I must have done some of it.

Q   Well, is this your signature on Exhibit 7, page 15?

A   Where about now?

Q   (Indicating)

A   No, it's not.  This is my signature (Indicating Exhibit 8) because this is not my signature.

Q   Mr. Dunmore, let me ask you, we're looking at signatures.  Are these signatures that are actually signed on a piece of paper, or is it something that the computer does?

A   Something the computer.

Q   So whoever completes it, punches a button

0024

and says it is me, and it puts their signature on them?

A   Yes, this one is mine, but this one is not mine.  That is not my signature.

Q   I would like you to look at page CLT 420, which is the second page on Cumulative Exhibit 10. And I would ask you to take a look at that and see if you can identify it?

A   Yes.

Q   What is that?

A   This is a medical sheet.

Q   And on July 28th, 2012, were you the individual that asked Mr. Pastor those questions?

A   Yes.

Q   And did you ask him all of the questions?

A   Yes.

Q   Did you complete the answers?

A   Yes.

Q   Did you then sign a computerized --

A   Yes.

Q   Well, let me finish.

A   Oh, okay.

Q   Did you then sign a computerized version of that medical screen form and enter it into the system?

0025

A   Yes.

Q   Do you know why this form has a different signature on it than yours?

A   No.

Q   Do you remember as we sit here today what Mr. Pastor's answers were to those questions that you asked him?

A   By looking at them, yes.

Q   Well, I understand they are reflected on that sheet, but I am asking you, can you look at that and tell me whether those are the actual responses that he gave?

A   To my best knowledge, yes.

Q   Even though it is signed by somebody else?

A   Yes.

Q   You believe that those are the responses that he gave?

A   Yes, I do.

Q   Let me show you the first page of Exhibit

10 and ask you whether you've completed that form. And by completed, I mean did you input the different information into that form?

A   (Witness examines document).  Yes.

Q   Is there anything on that form that you did not complete?

0026

A   No.

Q   Since I have lost my copy, if you don't mind, I will look over your shoulder for one second. Mr. Dunmore, I will ask you to look at what has been marked Exhibit 10.  And this is a computerized screen.  And I would ask you if this information is placed on the screen at the time of booking?

A   It is.

Q   To the best of your knowledge, was this information that is on Exhibit 10, placed on this form at the time Mr. Pastor was booked on July 28th, 2012?

A   By looking at it, but where it says "Inmate Classification", he didn't come in as a lunacy on that by my knowledge.

Q   What is your recollection of what he came in as?

A   As a regular inmate.

Q   Well, but you told me you completed this form, right?

A   Uh-huh (Indicating yes).

Q   Is that right?

A   I think I did.

Q   All right.  So was there anyone else besides you that would have completed this form on

0027

Mr. Pastor?

A   No, because I was doing the booking.

Q   So the form states that he came in on a lunacy, correct?

A   Uh-huh (Indicating yes).

Q   And I want to show you an exhibit and see if this refreshes your recollection?

A   Okay.

Q   I would like you to look at Exhibit 3, Mr. Dunmore, and tell me if that refreshes your recollection about why Mr. Pastor was at the jail and why he was a lunacy admission?

A   No, this don't.

Q   Okay.  You would agree with me that that's an order of the Chancery Court of Adams County?

A   It says, yes.

Q   Let me finish my question.  That it's an order by the Chancery Court of Adams County, Mississippi, signed by Special Master Tim Cotton, that finds that Mr. Pastor is open quote "certainly a danger to himself" closed quote.

A   Uh-huh (Indicating yes).  It says it.

Q   So if you will look back at Exhibit 10, which is the form you testified you completed, is the reason that he was marked as a lunacy classification

0028

because he was on a hold from Chancery Court?

A   Now this form --

MR. ALLEN:  Let him finish.

Q   (Mr. Jaques)  I'm finished.

A   This form, we never did receive anything like this.

Q   So it is your testimony that this order was never provided to anyone at the jail with respect to Mr. Pastor?

A   Right, because we never got, I never seen this; we never seen anything like this.

Q   Well, what was your understanding of why he was there?

A   When we got there, we just thought maybe he did something that, when we book, bring them in like any other inmate -- because he came in, when he came in, he came in like nothing had happened or nothing was wrong with him.

Q   So it is your testimony that you had no idea that he was under an order?

A   No, this is my first time seeing that.

Q   All right.  Let's look back at the sheet you completed.  You testified nobody else would have put lunacy, correct?

A   Uh-huh (Indicating yes).

0029

Q   Is that right?

A   Right.

Q   And the one under that says Felon/Misdemeanor and it's marked "M".  That had to be you that marked that, correct?

A   Misdemeanor.

Q   Escape Risk, "N" for No?

A    Yes.

Q    And Suicide Watch, what did you put there?

A    It says a "Y" but I don't recall putting that because he was not under suicidal watch.

Q    You don't recall doing it, but then again --

A    No.

Q    No one else could have done it, right?

A    Right, but I didn't do it.

Q    Do you know who mysteriously put the "Y" in the Suicide Watch block?

A    No.

Q    Cell Assignment HC1, did you put that in there?

A    Yes, I probably have.

Q    What does Billing Code "3" mean?  What does that mean?

A    Where do you see that at now so I can see

0030

where you are talking about?

Q    (Indicating)

A    I don't know.

Q    Did you put that in there?

A    No.

Q    See over here where it says Mental Illness, "Y"?

A    I see the "Y", but I didn't put that either.

Q    Well, now I will tell you that Mrs. Smith testified that either you or Mrs. Smith were the only ones that could have completed that form?

A    Uh-huh (Indicating yes).

Q    Do you believe Mrs. Smith put that on there?

A    I can't say, so I really don't know.

Q    But you think you did not?

A    Yes.

Q    And that would be with respect to the Mental Illness classification and the Suicide Watch?

A    Right.

Q    You realize Mr. Pastor hung himself in the jail on July 28th?

A    Yes.

Q    Subsequent to his death, did you undertake

0031

to determine why he was even in the jail in the first

place?

A   No.  What happened was, when we left, when we looked at him for the last time when the shift was changing and we left, we were called back to come back to the jail because he had died.  And when we went back, there he was, in his cell.

Q   Okay.  You would agree with me that that form completed on July 28th, 2012, reflects that he was on suicide watch?

A   From the looks of it, but we didn't put him on suicide watch because he said that he wasn't suicidal.  This form that you just showed me, we never did get a form like this.  Now who ordered this or wrote it in, it's not true.  But if we had got a form like this, we would have knew and wouldn't have put no clothes on him.

Q   Let me be sure.  If you had obtained an order like that that said --

A   But see, it is saying -- not cutting you off.

Q   Let me finish my question.  Is it your testimony, Deputy Dunmore, that had you received a form like this that said he was a danger to himself, that he would have been put on suicide watch and he

0032

wouldn't have been given any clothes?

A   Right.  That is the normal process; not normal clothes, he gets a gown, a paper gown.

Q   So if you have an order signed by a judge in Adams County, Mississippi, that says that an inmate is a danger to himself, you are going to treat that inmate as a suicide risk?

A   Yes.

Q   And to do otherwise, is unreasonable, isn't it?

A   Uh-huh (Indicating yes).  Yes.

Q   Mr. Dunmore, let me ask you about the policies and procedures at the jail with respect to individuals that are on suicide watch?

A   Uh-huh (Indicating yes).

Q   How are they treated differently?  And all of my questions go to the time period what was in place July of 2012.  Can we agree on that?

A   Okay.

Q   So to the best of your recollection, July of 2012, how would somebody that came into the jail

and was determined to be on suicide watch be treated differently than someone that was not?

A   First of all, when we book them in, we will walk him to his cell.  What we do is we give him a

0033

paper gown to put on.  That is all we would have. And probably the mattress that he lay on; that is it. He wouldn't have got no clothes, no jumpsuit, no underwear or no nothing.

Q   Why not?

A   Because he was a threat to himself.  And not only that, we wouldn't give him towels, soap, nothing like that.  We would give him a Styrofoam cup to drink out of.

Q   Would you give him a toothbrush?

A   No.

Q   And the reason you don't give them a toothbrush or a blanket or clothes is because why?

A   They will cut themselves or hang themselves, whatever.

Q   Just like Mr. Pastor did?

A   Yes, that's why we didn't, we don't give them that.

Q   And so had you all had a copy of Exhibit 3, this order, with respect to Mr. Pastor, he would have been placed on suicide watch.  He would have not had any clothes.  He wouldn't have been given a toothbrush, and y'all would have watched him?

A   Yeah.  We would look at him every time.  We will peep in there at him.

0034

Q   Like how often?

A   Maybe every 15 minutes we will look inside the window.

Q   But if they are not on suicide watch, you don't do that, right?

A   No.

Q   So you are telling me if y'all would have had this order, Exhibit 3, it's probable that Mr. Pastor would be alive today?

A   Yes, because we didn't have this.  This is my first time looking at something like this.

MR. JAQUES:  Let me take a break for just a minute, please.

(OFF RECORD)

Q   (Mr. Jaques)  Mr. Dunmore, prior to Mr.

Pastor's death, do you remember using those paper clothes on anybody at the jail?

A    We have had them, but I have seen inmates with them worn.

Q    Before Mr. Pastor's death?

A    Yes.

Q    Mr. Dunmore, you don't have any special training in determining whether someone is a suicidal risk, do you?

A    No.

0035

Q    That is not something that you attempt to do when you book an inmate in, is it?

A    No.

Q    What is the purpose of asking them questions on that form about whether or not they are suicidal or whether there is a history of suicide or anything like that?

A    To see exactly where their mind is at.

Q    Then what do you do with the form once you are finished with it?  Do you give it to somebody else?

A    We will log it in, and what we will do is we will tell our supervisor.  They will pull it up and see and determine what needs to be done.

Q    And who was the supervisor with respect to Mr. Pastor?  Mrs. Smith?

A    Mrs. Smith was.

Q    So that form would have gone to Mrs. Smith?

A    We would have told her about what was on the form, yes, and she could have pulled it up in the control room.

Q    And based upon what she had, she would then make the decision whether --

A    Yes.

Q    Let me finish.  Based on what she had that

0036

you sent her, she would then make the decision on whether he was a suicide risk?

A    Yes.

Q    Is that right?

A    Yes.

Q    And do you know what she decided with respect to Mr. Pastor?

A    No.  We just put him in a holding cell because when we looked at the questions, and as you

go down, we ask the questions.  And when he said Yes,
Have you been hospitalized for mental problems within
the last year?  He said, Last night.  Well, and my
first thing, Well, what happened?  Why was you in the
hospital?  But we can't make --

Q   Did you ask him why he was over there?

A   Yeah.

Q   And what did he say?

A   You can't make them answer that.

Q   Did he say anything, though?

A   He didn't say anything.  So I went to the
next question.  I asked him, well, Have you ever
attempted to commit suicide?  He said, No.  We go
down to the next one, Are you currently thinking
about it?  He said No.

Q   Okay.

0037

A   So he didn't give us no indications about
he was attempting or had ever tried it or whatever.
The only thing he was talking about, he was
talkative, laughing and talking to Mr. Conn about his
tattoos and everything else.

Q   And sometimes people tell the truth,
sometimes they lie, correct?

A   Well, yes.

Q   And we know that he killed himself a few
hours later, correct?

A   Yes.

Q   And notwithstanding his answers on the
medical screening form, it is still your testimony
had you had this order, he would have gone on suicide
watch?

A   We would have known it.

Q   And you would have put him on suicide
watch?

A   Yes.

Q   I want to talk to you about the checks that
you actually did do, you and Deputy Conn, on Mr.
Pastor?

A   Okay.

Q   And specifically, I want to talk about the
time period after y'all gave him his sandwich and put

0038

him back in his room and gave him the medicine.  Do
you remember that?

A   Yes.

Q   Was that about 4:35?

A   I think so because we feed them at different times.  And once we feed them, we come back, we will look in on them.  And sometimes, one time he was standing at the window looking out of the door, looking out.

Q   Do you have any specific recollection of checking on him between 4:35, when you gave him his medicine and sandwich, and then left, and when you left for the day at the end of your shift?

A   Once, I think.  I only did it twice because I was outside most of the time.  I wasn't in the building.

Q   If you checked on him, that camera would have caught you checking on him?

A   Yes.

Q   There is no way you could have checked on him without that camera picking you up?

A   That's correct.

Q   So if that camera didn't pick you up between 4:35 and 6:00, you didn't check on him?

A   Right.

0039

MR. JAQUES:  I would like to mark your statement, Mr. Dunmore, as the next exhibit.

(EXHIBIT 11 MARKED FOR IDENTIFICATION)

Q   (Mr. Jaques)  Mr. Dunmore, I am going to ask you if you can, can you read this for us or would you like --

A   Uh-huh (Indicating yes).  I think I can do it.  Go ahead and read it?

Q   Please, if you could.

A   (Reading)  "Approximately 1440, Nicholas Pastor was booked into the Adams County jail.  After that he made his phone call.  We then, then -- well, we then, Mr. Conn and I, put him in Holding Cell One. I then took the inmates out with the dogs outside. Shawn Timmons, I think, saw Mr. Walt Brown and talked with him.  After that, we went into the kitchen, got the sandwiches and medication, I think it is, and juice and went to the control room and got his medicine, his meds" --

Q   Let me stop you one second.  I think you skipped a line.  Would you pick up on the "After that" please, on this line?  Do you see where my finger is on here?

A    (Reading) "After that, we came back in. I put, okay, I put the inmate back in 2E zone, that is

0040

after we came back from outside. And went into the kitchen and got the sandwiches and juice. And went back to the control room, got his meds, and went back out and gave him his meds, sandwiches. Mr. Conn gave him water with his meal. He asked for some juice and we gave him some juice. We went upstairs and finished feeding."

Okay, now this goes back as I remembered it. "As we were booking, Pastor started talking to us about his tattoos and the screws in his leg. After that, we put him, we came back to booking and was talking to the inmate."

Now when we were talking to the inmate, he was asking about Buckshot, one of the dogs, because he got shot in the leg with a shotgun, and he asked what was wrong with the leg. That is why I wrote that. I remember him asking about the dogs.

Q    And this is in your handwriting?

A    Yes.

Q    Who requested that you do that?

A    That is when the officer asked me exactly what happened, the investigating officer.

Q    Would you agree with me, Mr. Dunmore, that if an inmate is a suicidal risk, that the sheriff's deputies owe him a duty to prevent him from

0041

committing suicide?

A    Yes. They know it.

Q    And if they know it and they don't do it, that is unreasonable, isn't it?

A    Yes.

MR. JAQUES: I would have nothing further.

EXAMINATION BY MR. ALLEN:

Q    Mr. Dunmore, ultimately Sergeant Smith is the shift sergeant, is that correct?

A    Correct.

Q    And if she decides someone is or is not a suicide risk, she makes the ultimate determination?

A    Yes.

Q    Regardless of what you think, you feed her the information, she makes the call?

A    Correct.

MR. ALLEN: That's all.

MR. JAQUES:  Thank you, sir.  That is it.

MR. ALLEN:  He will read and sign.

DEPOSITION CONCLUDED AT 4:00 p.m.

0042

        CERTIFICATE OF COURT REPORTER

    I, Victoria "Tina" Wilkinson, Court Reporter and Notary Public in and for the County of Madison, State of Mississippi, hereby certify that the foregoing pages contain a true and correct transcript of the testimony of RONALD DUNMORE as taken stenographically by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription to the best of my skill and ability.

    I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in this matter.

    I further certify that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

    Witness my signature and seal, this the 22nd day of June, 2014.

Victoria "Tina" Wilkinson

RPR #31921  CCR #1138

My commission expires:  February 18, 2018

0043

        CERTIFICATE OF DEPONENT

    I, RONALD DUNMORE, certify that I have examined the foregoing pages as to the corrections thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me on JUNE 18th, 2014, except for the list of corrections, if any, attached on a separate sheet with the page number, line number and the desired correction/change.

    Witness my hand, this the    day of

    , 2014.        _____

Ronald Dunmore
CERTIFICATE
Submitted and sworn to before me, this
_____ day of _____, 2014.

MY COMMISSION EXPIRES:        _____
_____        NOTARY PUBLIC